UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

JEFFREY P. OSBORNE and
KENDRA L. OSBORNE,  No. 7-13-12162 TL

    Debtors.

DANA GROSS,

    Plaintiff and
    Counter-Defendant,

v.  Adv. No. 13-1082 T

JEFFREY P. OSBORNE and
KENDRA L. OSBORNE

    Defendants and
    Counter-Plaintiffs.

## MEMORANDUM OPINION

Dana Gross seeks a declaration that the amounts owed by Jeffrey and Kendra Osborne are nondischargeable under § 523(a)(2)(A) and § 523(a)(6).[1]  The Osbornes seek to avoid Gross's liens on their real property under § 522(f)(1)(A) or § 547(b).  The Court tried the dispute on September 23 – 24, 2014 and now holds that a portion of the Osbornes' debt to Gross is nondischargeable, and also that Gross's liens must be avoided.

I.     FACTS

The Court finds:

Gross and Kendra Osborne met in 2005 while working for Spartan Electronics in Deming, New Mexico.  Gross and the Osbornes also did volunteer work building houses for

---

[1] All statutory references are to 11 U.S.C.

Habitat for Humanity. Gross has a Bachelor of Science degree in engineering and a Master of Business Administration.

In the spring of 2006, Kendra Osborne approached Gross with a set of blueprints for a house and expressed her desire to build it. Kendra Osborne showed Gross estimates from Lowe's and Home Depot that the cost of construction materials for the house would be between $135,000 and $140,000.[2] The Osbornes were unable to obtain conventional construction financing because, inter alia, Kendra Osborne filed bankruptcy in 2006 and both Osbornes were recently divorced from prior spouses.

Gross believed Kendra Osborne had experience in construction management, as she had worked with her father, a contractor and homebuilder in Colorado. Gross also thought Jeffrey Osborne had expertise in construction, based in part on his extensive collection of building tools. Given his perceptions and a desire to find a good investment opportunity, in the summer of 2006 Gross agreed to lend money to the Osbornes and help them build the proposed house on a Deming lot the Osbornes bought at a tax sale (as improved, the "Property").

Part of the agreement was that Gross and the Osbornes would work together building the Property in their free time, doing most of the construction themselves. This way, they would build up substantial "sweat equity."[3] When the Property was done, the Osbornes agreed to get a permanent loan and use the loan proceeds to repay Gross's loan. They would also pay Gross an additional $5,000 as consideration for the loan.

---

[2] It is unclear from the testimony what materials, or even what improvements, were included in this estimate.
[3] The parties estimated that about half the cost of a house is labor.

-2-

Further, once the Property was completed and permanently financed, and Gross's loan repaid, the remaining "sweat equity" would be used to fund a business investing in, repairing, and "flipping" houses.

The Osbornes agreed to keep the Property unencumbered until Gross was repaid. They knew Gross was counting on the Property to ensure repayment. In addition, Kendra Osborne told Gross her father was near death and that her share of the estate would be more than enough to repay Gross. Gross relied on this representations. Gross made no investigation of this representation.

The parties never reduced any portion of their agreement to writing. The Osbornes never signed a promissory note or mortgage.[4] No loan or other agreement was ever executed. The Osbornes discouraged Gross from getting a mortgage to secure his loan because they said it would hinder their efforts to obtain take-out financing when the time came. Gross did not require the Osbornes to demonstrate their ability to repay the loan, nor did he check to see if any other liens or mortgages encumbered the Property.

Gross had a home equity line of credit (the "HELOC"), with a credit limit of $75,000. At the time he entered into the loan agreement with the Osbornes, the HELOC had a $0 balance. Beginning in July, 2006, Gross began drawing on the HELOC and loaning money to the Osbornes, usually $5,000 at a time. When his HELOC was fully drawn, Gross used other funds to make advances to the Osbornes.

---

[4] Gross held the mistaken opinion that a mortgage for a multiple-advance construction loan was impractical because he would have had to file an amended mortgage every time he made an advance. Clearly, that is not the case.

-3-

Gross did not require the Osbornes to segregate the funds he advanced, nor to account for how they spent the money. Gross did not require draw requests, cost estimates, or the like.

Construction on the Property began in July, 2006. The plans for the Property called for two houses, a small pool house and a larger main house. The Osbornes planned to build the pool house first and move into it while completing construction on the main house.[5] The Osbornes moved into the pool house in 2007 when a certificate of occupancy was issued.

In 2009, Gross got a job that required him to be out of town much of the time. Thereafter, he did little work on the Property. Although the parties hoped they could provide much of the labor for building the Property, the Osbornes had to hire a substantial portion of the labor.

By June 23, 2009, Gross had loaned the Osbornes $221,100.

On June 26, 2009, the Osbornes obtained a $67,500 line of credit from State Farm Insurance, secured by a first mortgage on the Property (the "State Farm Mortgage"). The mortgage was recorded July 14, 2009. The Osbornes did not disclose Gross's $221,100 loan on the State Farm Mortgage application, and their excuse for this very material omission is not credible.[6] The Osbornes drew down the entire $67,500.

There was conflicting testimony about Gross's knowledge of the State Farm Mortgage. Based on the credibility of the witnesses and the other evidence in the record, the Court finds that the Osbornes did not tell Gross about the State Farm Mortgage, and that Gross did not find out about it until well after his loan to the Osbornes was fully extended.

---

[5] This would allow the Osbornes to stop paying rent.
[6] The Osbornes testified they had not disclosed Gross's loan on the application because it was a "personal loan."

-4-

On August 3, 2010, the Osbornes modified the State Farm Mortgage (the "Modification"). The Modification gave the Osbornes a principal increase of $29,500 and increased the lien on the Property to $94,000. As with the original loan, Gross was not told about the modification and did not find out about it until it was too late. The Osbornes did not disclose Gross's loan on the Modification application.

A certificate of occupancy for the large house was issued September 30, 2010.

On November 1, 2011, the Osbornes borrowed $156,000 from Charles Schwab Bank, secured by a first mortgage on the Property (the "Schwab Mortgage"). The Osbornes used $94,000 of the loan proceeds to pay off the State Farm loan, devoting the remaining proceeds to finishing the Property and building a pool. The Osbornes did not tell Gross about the Schwab Mortgage, and Gross did not learn of it until he prepared to sue the Osbornes. The Osbornes did not disclose Gross's loan to Schwab. The loan balance on the petition date was $151,777.

After the Osbornes signed the State Farm note and Mortgage, Gross loaned the Osbornes $66,600, bringing the loan total to $287,700.[7]

Kendra Osborne received about $40,000 from her parents' estate in 2012. Instead of paying Gross this money, as she had promised, she bought a new truck, because "my mom had asked me to go ahead and buy a new truck . . . she knew I wanted to have a new truck and she didn't want me to have any car payments." In the same breath, however, Kendra Osborne testified that she hadn't spoken to her parents for ten years.

---

[7] This total is significantly higher than the original $140,000 estimate. Conflicting testimony made it difficult to determine the exact causes of the cost overrun. The Court attributes the cost overrun to the Osbornes' need to hire labor, the construction of the pool, and limitations of the estimate (*e.g.*, it may not have included both houses and/or such items as windows, sceptic system, land grading, and a well).

-5-

On March 21, 2013, Gross filed a complaint against the Osbornes in the Sixth Judicial District Court Luna County, New Mexico.[8] The Osbornes did not respond to the complaint. Gross obtained a default judgment for $252,000[9] and recorded a transcript of judgment on June 3, 2013. The state court also granted Gross an equitable mortgage on the Property. The Osbornes filed their voluntary Chapter 7 petition on June 26, 2013.

In their bankruptcy schedules, the Osbornes valued the Property at $257,800.

## II.    DISCUSSION

A.    General Nondischargeability Standards.

Exceptions to discharge are "narrowly construed [such that] doubt as to the meaning and breadth of a statutory exception is to be resolved in the debtor's favor." *Cobra Well Testers, LLC v. Carlson (In re Carlson)*, 2008 WL 8677441, at *2 (10th Cir. 2008) (quoting *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997)).

A creditor seeking to avoid discharge bears the burden of proving the elements of § 523(a)(2)(A) by a preponderance of the evidence. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

B.    Section 523(a)(2)(A).    Gross's primary claim against the Osbornes is that the subject debt is nondischargeable because it was procured by false representations. Section 523(a)(2)(A) excepts from discharge debts for "money, property, services, or an extension, or renewal of credit, to the extent obtained by false pretenses, a false representation, or actual

---

[8] *See* CV-2013-00085
[9] The judgment amount reflects some payments the Osbornes made on the loan, including paying off Gross's truck ($15,179.69) and paying $5,000 that Gross used as a down payment on a house.

-6-

fraud." 11 U.S.C. § 523(a)(2)(A). A creditor seeking to except its debt from discharge under § 523(a)(2)(A) must prove, by a preponderance of the evidence that:

      1.      The debtor made a false representation;
      2.      The debtor made the false representation with the intent to deceive the creditor;
      3.      The creditor relied on the false representation;
      4.      The creditor's reliance was justifiable; and
      5.      The representation caused the creditor to sustain a loss.

*Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009) (quoting *Fowler Bros.*, 91 F.3d at 1373 (10th Cir. 1996)).

"False representations are 'representations knowingly and fraudulently made that give rise to the debt.'" *Adams Cnty. Dept. of Soc. Services v. Sutherland–Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354 (Bankr. D. Colo. 2006) (quoting *Cobb v. Lewis (In re Lewis)*, 271 B.R. 877, 885 (10th Cir. BAP 2002)). "Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions." *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (10th Cir. BAP 2013). False pretenses under § 523(a)(2)(A) are "'defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor.'" *Id.* (quoting *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006) (citations omitted)).

A debtor's failure to disclose material facts is actionable as a false representation or false pretenses under § 523(a)(2)(A). *See Fowler Bros.*, 91 F.3d at 1374 ("failure to disclose such information constitutes a 'false representation' or 'false pretenses' under § 523(a)(2)(A)"); *Haeske v. Arlington (In re Arlington)*, 192 B.R. 494, 498 (Bankr. N.D. Ill. 1996) (failure to disclose facts is a misrepresentation where the omission creates a false impression known by the

-7-

debtor); *Heide v. Juve (In re Juve)*, 761 F.3d 847, 851 (8th Cir. 2014) ("a debtor's silence as to a material fact can constitute a false representation under § 523(a)(2)(A)"); *Janes v. Lyons (In re Lyons)*, 454 B.R. 174, 177 (Bankr. D. Kan. 2011) ("fraud by silence may constitute false pretenses under § 523(a)(2)(A)"); *Rainer Title Company, Inc. v. Demarest (In re Demarest)*, 176 B.R. 917, 920 (Bankr. W.D. Wash. 1995) ("silence can create a false impression, providing the basis for a misrepresentation that is actionable under § 523(a)(2)(A)").

"[A] borrower has the duty to divulge all material facts to the lender." *Caspers v. Van Horne (In the Matter of Michal Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987) (citing *Matter of Newmark*, 20 B.R. 842, 855 (Bankr. E.D.N.Y. 1982)), *abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991). This does not mean that the debtor must "bare his soul" to the creditor, but the creditor does have "the right to know those facts touching upon the essence of the transaction." *Id.* A debtor must disclose facts he knows "may justifiably induce the other party to act with respect to the transaction to be consummated." *In the Paint, L.L.C., v. Archibald (In re Archibald)*, 482 B.R. 378, 390 (Bankr. D. Utah 2012).

The Tenth Circuit construes § 523(a)(2)(A) narrowly to limit the harsh result of nondischargeability to "frauds involving moral turpitude or intentional wrong." *DSC National Properties, LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 169 (10th Cir. BAP 2012) (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986)), *abrogated on other grounds by Grogan*, 498 U.S. 279). To avoid discharge based on false pretenses, false representation, or actual fraud, the creditor must prove the debtor "acted with the *subjective intent* to deceive the creditor." *Johnson*, 477 B.R. at 169 (emphasis in original). "Intent to deceive may be inferred

-8-

from the totality of the circumstances." *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 922 (10th Cir. BAP 2010).

In assessing the creditor's reliance, "[t]he appropriate standard is not 'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's false representation." *Riebesell*, 586 F.3d at 791–92 (citing *Field v. Mans*, 516 U.S. 59, 74–75 (1995)).[10] Instead, the Court must inquire into "whether the actual creditor's reliance was 'justifiable' from a subjective standpoint." *Id.* Even though a subjective test is used, the creditor is still required to "'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it." *Id.* (quoting *Field*, 516 U.S. at 60). "Reliance is not justifiable if the facts and circumstances make it apparent from a cursory glance that the representations are false, or where the creditor 'has discovered something which should serve as a warning that he is being deceived.'" *Penix v. Parra (In re Parra)*, 483 B.R. 752, 769 (Bankr. D.N.M. 2012) (quoting *Field*, 516 U.S. at 71).

Reliance on a debtor's representations is justifiable if no "red flags" alert the creditor that further investigation is necessary. *See Colorado East Bank & Trust v. McCarthy (In re McCarthy)*, 421 B.R. 550, 563 (Bankr. D. Colo. 2009) (finding no investigation required when applying the higher reasonable-reliance standard under § 523(a)(2)(B)).[11] "A creditor is required to make further investigation where 'under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived.'" *The William W. Barney, M.D. P.C. Ret.*

---

[10] Objective reasonableness is still relevant because "reasonableness goes to the probability of actual reliance." *Field*, 516 U.S. at 76.

[11] *Cf. Copper*, 423 B.R. at 924 (holding continued lending in reliance on debtor's representations is unjustifiable where "various red flags ar[i]se.").

-9-

Case 13-01082-t    Doc 39    Filed 10/31/14    Entered 10/31/14 15:42:22 Page 9 of 16

*Fund v. Perkins (In re Perkins)*, 298 B.R. 778, 792 (Bankr. D. Utah 2003) (quoting *Field*, 516 U.S. at 71).

  B. <u>The Alleged Misrepresentations</u>.

Gross bases his case on four alleged misrepresentations of the Osbornes: (1) they could not obtain permanent financing; (2) they would pay him back from Kendra Osborne's inheritance; (3) the Property was unencumbered; and (4) if they gave Gross a mortgage on the Property, the Osbornes would not be able to get permanent financing and repay him.

    1. <u>Inability to Obtain Alternative Financing</u>. Gross argues he was induced into making advances to the Osbornes by their representations that they could not get financing, while in fact the Osbornes were able to borrow money from State Farm and Schwab. Gross argues that had he known about the loans he would have stopped loaning money. This argument is unpersuasive for several reasons. First, it is clear that when construction began, the Osbornes could not get conventional financing. That is why Gross agreed to loan them money. By the time of the State Farm Mortgage, Gross had already loaned the Osbornes $221,000.

Second, it was not the loans from State Farm and Schwab that hurt Gross, but the mortgages on the Property. That issue is discussed below. The loans, by themselves, probably helped rather than hurt Gross, because at least part of the proceeds was used to construct the large house on the Property.

Third, the documentary evidence Gross presented in support of his argument, a series of emails between the parties, were sent between October 17, 2011 and May 8, 2012. By October, 2011, the loan had been fully advanced for more than a year. Thus, there could be no reliance on any representations made in the emails.

-10-

Finally, the relief granted below is co-extensive with the relief that would have been granted under this portion of Gross's claim.

        2.        <u>Repayment From Kendra Osborne's Inheritance</u>. Kendra Osborne promised Gross he would be repaid when she received her inheritance from her father. No such payment was ever made, however, and Gross argues that the promise was a fraudulent representation. The argument fails. A promise to repay alone is typically insufficient to support a claim under § 523(a)(2)(A). *Farina v. Balzano (In re Balzano)*, 127 B.R. 524, 531 (Bankr. E.D.N.Y. 1991) ("A bare promise to be fulfilled in the future, which is not carried out, does not render a consequent debt nondischargeable under § 523(a)(2)(A).") (citation omitted). Rather, Gross must show the Osbornes never intended to repay him from any inheritance they received. *See McCrary v. Barrack (In re Barrack)*, 217 B.R. 598, 606 (9th Cir. BAP 1998) ("'[A] promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A)." (quoting *Rubin v. West (In re Rubin)*, 875 F.2d 755, 759 (9th Cir. 1989)).

Testimony at trial showed that Kendra Osborne received about $40,000 in inheritance in 2012 when her mother died. Instead of paying this money to Gross, Kendra Osborne used it to buy a truck, stating, as noted above, that her mother had always wanted her to have a vehicle without a monthly payment. This is a weak excuse, reflecting poorly on the Osbornes, but does not show that they never intended to repay Gross from the inheritance. Without this showing, Gross has not carried his burden of showing a false representation was made.

From the trial testimony, the Court concludes that at some point between 2006 and June, 2009 (see below for why the Court picked this date), the Osbornes realized they were not going to be able to repay Gross, and/or were unwilling to make the substantial sacrifices necessary to

-11-

repay him. At that point, further borrowing from Gross became fraudulent. Unfortunately, there is no evidence when this point was reached, so the Court cannot grant relief under this theory.[12]

        3.    <u>Construction Lien Would Prevent Osbornes From Obtaining Permanent Financing</u>. Gross next argues that he relied on the Osbornes' representation that granting Gross a construction mortgage would prevent them from obtaining permanent financing. The Osbornes concede they asked Gross to leave the Property unencumbered because it would hurt their efforts to get a loan.

There are problems with this part of Gross's claim. First, the statement is not a representation of fact, but an opinion about how prospective lenders would react. Second, Gross did not prove the Osbornes made the statement with the intent to deceive or defraud him. Third, Gross did not justifiably rely on the alleged representation. Gross, the holder of an MBA, made no effort to determine if a construction mortgage would hinder the Osbornes from obtaining permanent financing. He should have looked into the matter and determined whether the Osbornes' opinion was accurate or justified. Gross did not carry his burden of proving the necessary elements of a § 523(a)(2)(A) claim with respect to the alleged representation.

        4.    <u>Property Free and Clear of Encumbrances</u>. Finally, Gross argues that the Osbornes promised to keep the Property unencumbered until he was paid off and did not disclose that they had mortgaged the Property. Gross asserts that, had he been told of the mortgages, he would immediately have stopped loaning money to the Osbornes. As set forth above, the Court finds that the Osbornes did not tell Gross about any of the mortgages. The parties agreed that the

---

[12] The point may have come in 2009 when Gross got an out-of-town job and could no longer contribute his labor to the construction project. There is insufficient evidence to make a finding, however.

-12-

Property would remain unencumbered until construction was complete and Gross's loan repaid. Knowing that Gross was relying on the value of the Property for his repayment, the Osbornes had a duty to inform Gross of the mortgages before borrowing any more money from him.[13] The Osbornes' breach of that duty is a material misrepresentation and/or false pretenses.

The Osbornes had no legitimate reason to conceal the mortgages from Gross. The only reason not to tell Gross was to ensure he would continue loaning money. The Court finds the Osbornes intended to deceive Gross into loaning more money by keeping him in the dark.

Finally, the Court finds that Gross justifiably relied on the Osbornes' promises, representations, and material omissions regarding the mortgages. A cursory inspection would not have alerted Gross that the Osbornes had mortgaged the Property. While an objectively reasonable lender would have searched the record (and gotten a mortgage!) to protect its interests, that is not the standard. Investigation under a justifiable reliance standard is only required where "red flags" raise questions as to the veracity of the representations. There was nothing that would have alerted a person of Gross's intelligence and understanding that the Osbornes had mortgaged the Property without telling him. This was Gross's first foray into construction lending. He trusted the Osbornes to be straight with him. Gross's failure to take the steps commercial lenders would have taken does not render his reliance unjustifiable.

Gross was foolish not to get a mortgage and the Osbornes knew it. The Osbornes, on the other hand, were deceitful in not telling Gross they had pledged the Property as collateral to third parties, Gross reasonably relied on the false representation/false pretenses, and was damaged by

---

[13] Mortgaging the Property, without more, may not have been fraudulent. Intervening events such as cost overruns, design changes, and less "sweat equity" labor than anticipated may have made it necessary to borrow more money. Rather, it was the Osbornes' decision to *keep silent* about mortgaging the Property that constituted the misrepresentation or false pretenses.

-13-

all amount he loaned after June 26, 2009, i.e. $66,600. Gross met his burden of proof for nondischargeability under § 523(a)(2)(A) to this extent.[14]

    C.    Section 523(a)(6).

Gross asserts that the Osbornes' debt to him is nondischargeable under § 523(a)(6). To succeed on such a claim, a creditor must prove "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

Nondischargeability under this subsection requires "a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). The Tenth Circuit has held that willful and malicious are separate, distinct requirements and that a claim under § 523(a)(6) fails without proof of both. *Panalais v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004). "The 'willful' element requires both an intentional act and an intended harm; an intentional act that leads to harm is not sufficient." *Parra*, 483 B.R. at 772 (citing *Geiger*, 523 U.S. at 61). The "malicious" element requires proof of "an intentional, wrongful act, done without justification or excuse." *Id.* at 773.

The Tenth Circuit uses a subjective standard in determining whether a defendant desired to cause injury or believed the injury was substantially certain to occur.[15] The movant "bears the burden of establishing nondischargeability by a preponderance of the evidence." *Fletcher v. Deerman (In re Deerman)*, 482 B.R. 344, 369 n.18 (Bankr. D.N.M. 2012).

---

[14] The Court believes the Osbornes formed the intent not to repay Gross when they first began seeking a loan that would be secured by the Property. There is no doubt the search began before June 26, 2009 when the Osbornes signed the State Farm loan documents. The evidence presented, however, does not show when the Osbornes began their search, so the Court cannot go back before June 26, 2009.

[15] "[M]alicious intent [may] be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights." *C.I.T. Financial Services, Inc. v. Posta (In re Posta)*, 866 F.2d 364, 367 (10th Cir. 1989), *abrogated on other grounds by Geiger*, 523 U.S. at 61.

-14-

The Pretrial Order contains allegations the Osbornes willfully and maliciously concealed the encumbrances on the Property and failed to inform Gross of loan proceeds they received. However, no argument regarding, or evidence demonstrating, willful or malicious injury by the Osbornes was presented at trial. Although Gross showed that the Osbornes intentionally concealed the existence of the mortgages, he did not show the Osbornes intended harm or acted with malice. Further, the Court wishes to be careful not to conflate fraud claims with tort-related malicious injury claims. Gross did not carry his burden of proof on his § 523(a)(6) claim.

D.  Section 522(f).

Pre-petition, Gross recorded a transcript of judgment and obtained an equitable mortgage on the Property. The Osbornes seek to set these liens aside as impairing their homestead exemption. An equitable mortgage is a judicial lien, subject to avoidance under § 522(f)(1)(A). *See, e.g., In re Turetsky,* 402 B.R. 663, 666 (Bankr. W.D. Pa. 2009) (equitable mortgage is a judicial lien and may potentially be avoided pursuant to § 522(f)(1)(A)); *In re Dudley,* 68 B.R. 426, 427 (Bankr. S.D. Fla. 1986) (stating "there is no question that an equitable lien is a judicial lien and, therefore, within the scope of § 522(f)(1)"). *See also Farrey v. Sanderfoot,* 500 U.S. 291 (1991) (implying that equitable liens imposed in divorce decrees are judicial liens). A judgment lien, of course, is the very definition of a judicial lien. Given the undisputed value of the Property ($257,800) and the amount of the Schwab Mortgage ($151,777), the equity available for the homestead exemption is $106,023. The Osbornes' claimed homestead exemption totals that amount, so Gross's equitable mortgage and transcript of judgment must be avoided entirely.

E.  Section 547(b).

As Gross's liens will be set aside under § 522(f), the Court need not address whether the Osbornes have satisfied all of the elements of § 547(b).

  F.  <u>Section 523(d)</u>.

The Osbornes have asked for an award of their attorney's fees incurred in defending this action. If a creditor requests a determination of dischargeability that is not substantially justified, and the court determines the debt is dischargeable, the court shall award the debtor fees and costs. 11 U.S.C. § 523(d). Because the Court ruled in Gross's favor with respect to $66,600 of the debt at issue, the attorney's fee request will be denied. Gross did not prevail on all issues, but his position was substantially justified.

    III.  <u>CONCLUSION</u>

The Court grants partial relief to Gross, holding that $66,600 of his loan is nondischargeable under § 523(a)(2)(A). The Court will set aside Gross's judicial liens as impairing the Osbornes' homestead exemption. A separate judgment will be entered.

_/s/ David T. Thuma_____

Hon. David T. Thuma
United States Bankruptcy Judge

Entered October 31, 2014.

Copies to:

Dean B. Cross
P.O. Box 16294
Albuquerque, NM 87109

R. Trey Arvizu, III
P.O. Box 1749
Las Cruces, NM 88004-1479

-16-